**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:15-cv-00224-MR
[CRIMINAL CASE NO. 2:12-cr-00011-MR-DCK-1]**

| | | |
|---|---|---|
| **WILLIAM ANDREW ESTES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [CV Doc. 1][1] and the Petitioner's Motion for Post-Conviction Discovery Pursuant to Rule 6 of the Rules Governing 2255 Habeas Proceedings [CV Doc. 6]. The Petitioner is represented by attorneys E.J. Hurst, II and Marcia G. Shein.

_____

[1] Because this Memorandum and Order must reference documents contained on the docket in both Petitioner's civil case and in his various criminal cases, the Court will cite to documents from Petitioner's civil case with the prefix "CV." Citations to documents from Petitioner's criminal cases will include a reference to the docket number for the particular case being referenced.

## I.    FACTUAL BACKGROUND

In November 2010, federal and state law enforcement officials began investigating a large-scale methamphetamine distribution conspiracy led by Michael James Taylor and involving several others, including William Wesley Hargett, Sonya Maddy, Larry Watkins, Kirsten McGillivray, Adam Cochran, Johnny Frady, and Ricky Fisher.    Through their investigation, law enforcement officials learned that Taylor owned the Budget Inn Motel in Sylva, North Carolina, and used the motel as a distribution point for large quantities of methamphetamine.    Taylor and other members of his distribution network also conducted drug transactions at a house located at 19 Pine Street, Greenville, South Carolina ("the Pine Street residence"), as well as other locations within the Western District of North Carolina. [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 19 at ¶¶ 10, 11, 17, 18].

On June 3, 2011, the Petitioner William Andrew Estes was released from the North Carolina Department of Corrections after serving a 14-year sentence for first degree kidnapping.    Prior to the Petitioner's imprisonment, the Petitioner was in a relationship with Taylor's mother and acted as a step-father to him.    Also at some point, Taylor and the Petitioner were incarcerated together and maintained their bond during that time.    After his release from prison, the Petitioner contacted Taylor to discuss his financial situation and

to talk about ways that the Petitioner could make money. Eventually, Taylor informed the Petitioner about his methamphetamine distribution and the Petitioner began to work for Taylor. [Id. at ¶¶ 12].

The Petitioner was considered Taylor's "enforcer" during the conspiracy. [Id. at ¶ 35]. Taylor referred to the Petitioner as his "right hand man," although the Petitioner very rarely dealt directly with the sale or distribution of methamphetamine. [Id.]. One co-conspirator described the Petitioner's job as "beat[ing] people up and threaten[ing] people on behalf of Taylor." [Id. at ¶ 27]. The Petitioner is 6'2" tall and weighs 200 pounds. [Id. at 3].

The Petitioner was often observed in Taylor's presence when methamphetamine was sold or distributed. [Id. at ¶¶ 24, 25]. The Petitioner was observed on one occasion by a co-conspirator at the Pine Street residence when Michael Taylor received a delivery of approximately 2½ pounds of methamphetamine from a Mexican male. The Petitioner was observed assisting Taylor with weighing and repackaging the methamphetamine. [Id. at ¶ 19].

In June 2011, the Petitioner accompanied Taylor to meet with a co-conspirator who owed Taylor money for a drug debt. During that meeting,

Taylor demanded that the co-conspirator turn over the keys to her car as payment for the drug debt. [Id. at ¶ 30].

On another occasion in June 2011, law enforcement officials conducting telephonic surveillance of the conspiracy members heard Taylor direct a co-conspirator to use a vehicle to transport methamphetamine. Law enforcement later heard the Petitioner, in Taylor's absence, coordinating the pickup of that vehicle after the methamphetamine was delivered. [Id. at ¶ 20].

In July 2011, the Petitioner accompanied Taylor to a co-conspirator's house where Taylor introduced the Petitioner as a friend who had just gotten out of prison. The Petitioner accompanied Taylor on multiple other occasions to the co-conspirator's residence when Taylor was dropping off or picking up bulk amounts of methamphetamine. Taylor frequently used two magnetic boxes attached to the underside of his pickup truck to transport or hide methamphetamine. The Petitioner was present and witnessed Taylor using these boxes. [Id. at ¶ 25].

Following his arrest in August 2011, the Petitioner was housed in the same jail as Taylor and other co-conspirators. Taylor was overheard in the jail directing the Petitioner upon his release to travel to South Carolina to get money from "Shane" and "Pops," individuals who were known to distribute

methamphetamine for the Taylor conspiracy.  Taylor and the Petitioner were also overheard trying to identify who was "snitching" within the conspiracy. [Id. at ¶ 31].

While incarcerated, the Petitioner continued to speak freely about the conspiracy to other inmates.  The Petitioner detailed one event that occurred around July 4, 2011, when some unknown Mexicans made a delivery of methamphetamine to a motel in South Carolina where the Petitioner was present.  The Petitioner was patrolling the area outside the motel while waiting for Taylor.  At this point, the Petitioner and Taylor were suspicious that one of the co-conspirators was cooperating with law enforcement.  That co-conspirator was also travelling to the motel and the Petitioner believed that the co-conspirator intended to follow the Mexicans back to Atlanta, Georgia, to provide law enforcement with the location.  [Id. at ¶ 32].

The Petitioner stated in these jailhouse conversations that he never sold any methamphetamine but had been present when methamphetamine deliveries were made.  The Petitioner also described incidents where he confronted one of the members of the conspiracy by "putting hands on him" because the co-conspirator owed Taylor money.  [Id. at ¶ 33].

Eventually the Petitioner stopped talking freely about the conspiracy because he heard that an acquaintance had provided a statement to law

enforcement.  The Petitioner was heard saying that he was having someone find out when the acquaintance would be released and where he would reside. The Petitioner further stated that he had guns "stashed" and that if he "got out," they would not have to worry about witnesses.  [Id. at ¶ 34].

On July 21, 2012, while housed at the Cherokee County Detention Center in Murphy, North Carolina, the Petitioner was involved in an altercation with two of his co-defendants, Lonnie Payne, Jr. and Adam Cochran.  According to Payne and Cochran, the door between two inmate housing areas was left open and the Petitioner was able to enter the pod where Cochran and Payne were standing.  When the Petitioner entered the pod he assaulted both Payne and Cochran.   During the altercation, witnesses overheard the Petitioner yelling about Payne and Cochran "turning evidence."   Both Payne and Cochran sustained physical injuries from the assault.  The Petitioner later admitted committing the assaults and told law enforcement officers he could have easily killed Payne and Cochran but did not.  [Id. at ¶¶ 38-40].

## II.    PROCEDURAL BACKGROUND

On September 20, 2011, the Petitioner was charged in a Bill of Indictment, along with ten co-defendants, with conspiracy to possess with intent to distribute at least 50 grams of actual methamphetamine and at least

500 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. [Criminal Case No. 2:11-cr-00022-MR-DLH-2, Doc. 74]. The Federal Defenders of Western North Carolina were appointed to represent the Petitioner.

On May 18, 2012, the Petitioner entered into a Plea Agreement in which he agreed to plead guilty to a Bill of Information that charged a conspiracy involving a lower drug quantity, in exchange for which the Government agreed to dismiss the Indictment against the Petitioner. [Criminal Case No. 2:12-cr-00011-MR-DCK, Docs. 1 and 2]. The effect of this was to reduce the mandatory minimum sentence from ten years to five. [Id.].

In the Plea Agreement, the parties made a series of joint sentencing recommendations to the Court, including the following:

> a. The amount of actual methamphetamine that was known to or reasonably foreseeable by the defendant was 947.6 grams, which is a base offense level of 36, pursuant to U.S.S.G. § 2D1.1(c)(2);
>
> b. The defendant's offense level is decreased by three levels to 33, pursuant to U.S.S.G. § 2D1.1(a)(5), because he is entitled to an adjustment, pursuant to U.S.S.G. § 3B1.2, for a mitigating role[;]
>
> c. The defendant's offense level is further decreased to 32, pursuant to U.S.S.G. § 2D1.1(a)(5),

because the resulting offense level was greater than 32 and the defendant was a minimal participant;

d.    The defendant's offense level is increased by two levels to 34, pursuant to U.S.S.G. § 2D1.1(b)(2), because the defendant used violence or made a credible threat to use violence;

e.    The defendant's offense level is decreased by four levels to 30, pursuant to U.S.S.G. § 3B1.2(a), because the defendant was a minimal participant;

f.    The defendant's offense level is decreased two additional levels to 28, pursuant to U.S.S.G. § 2D1.1(b)(15), because the defendant was a minimal participant and he was motivated by an intimate or familial relationship to commit the offense and was otherwise unlikely to commit such an offense; the defendant received no monetary compensation from the illegal purchase, sale, transport or storage of controlled substance; and the defendant had minimal knowledge of the scope and structure of the enterprise;

*    *    *

i.    The parties agree that the appropriate sentence is one at the low end of the "applicable guideline range" and that neither party will seek a departure or variance from the low end of the "applicable guideline range."

[Id. at ¶ 7].    Despite these joint recommendations, the Petitioner acknowledged in the Plea Agreement that he understood that the Court would consider the Guidelines as advisory; that the Court had not yet determined the sentence and that any estimate of the likely sentence was "a

8

prediction rather than a promise"; that the Court had the discretion to impose any sentence up to the statutory maximum; and that the Court would not be bound by any recommendations or agreements made by the Government. [Id. at ¶ 6]. The Petitioner further agreed in the Plea Agreement, "in exchange for the concessions made by the United States," to waive his right to appeal his conviction or his sentence, except on the bases of ineffective assistance of counsel or prosecutorial misconduct. [Id. at ¶ 19].

On May 21, 2012, the Petitioner appeared before the Honorable Dennis L. Howell, United States Magistrate Judge, for a Rule 11 hearing. The Petitioner was placed under oath and was asked a series of questions by the Magistrate Judge, who recorded his responses. [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 8]. During this colloquy, the Petitioner averred that he could hear and understand the Magistrate Judge's questions and that his mind was clear. [Id. at 1-2].

The Magistrate Judge advised the Petitioner of the essential elements of the offense to which he was pleading guilty, as well as the minimum and maximum penalties. [Id. at 2-3]. In response to the Magistrate Judge's questions, the Petitioner affirmatively stated that he understood that the Court would not be bound by the Sentencing Guidelines in sentencing him and could impose a sentence greater or less than the sentence as provided

for by the Guidelines.  [Id. at 5].  The Petitioner further stated that he understood that if the imposed sentence was more severe than expected or the Court did not accept the Government's sentencing recommendation, he would still be bound by his guilty plea and would have no right to withdraw his plea.  [Id. at 5-6].

The Petitioner further admitted that he was guilty of the offense described in the Bill of Information; that his guilty plea was voluntary; that he understood and agreed with the terms of the written Plea Agreement; and that no promises were made to him other than the promises contained in that written agreement.  [Id. at 7-8].  The Petitioner also affirmed that he was waiving his right to appeal.  [Id. at 8].  Based upon the representations and answers given by the Petitioner, the Magistrate Judge found that his guilty plea was knowingly and voluntarily made and that the Petitioner understood the charges, potential penalties, and consequences of that plea.  [Id. at 9].

Following his guilty plea to the conspiracy charge, the Petitioner was charged with two counts of retaliating against a witness, in violation of 18 U.S.C. § 1513(b)(2), arising from the altercation with Payne and Cochran at the Cherokee County Jail.  [Criminal Case No. 2:12-cr-00023-MR-DCK-1, Doc. 1].  On January 24, 2013, the Petitioner pleaded guilty to both counts without a written plea agreement.  [Id., Doc. 11].

In preparation for the Petitioner's sentencing, the Probation Office prepared a Presentence Report ("PSR") with respect to both the conspiracy count in Criminal Case No. 2:12-cr-00011-MR-DCK and the retaliation counts in Criminal Case No. 2:12-cr-00023-MR-DCK. [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 19]. With respect to the conspiracy count, the probation officer calculated a total offense level of 35 and a criminal history category of II, yielding an advisory Guidelines range of imprisonment of 188 to 235 months. [Id. at ¶¶ 71, 84, 102]. In calculating the total offense level, the probation officer recommended a two-level reduction based on the Petitioner's role as a minor participant in the conspiracy, rather than the four-level reduction and other reductions recommended by the parties in the Plea Agreement based on the assertion that the Petitioner was a minimal participant. [Id. at ¶¶ 49, 51]. In response to the PSR, the Petitioner presented several objections, including an objection to the failure of the probation officer to recommend a decrease in his offense level by four levels based on his minimal participation in the charged conspiracy. [Id. at 31-33; Doc. 21]. In accord with the Plea Agreement, the Government also objected to the probation officer's failure to recommend a minimal-participant reduction. [Id., Doc. 19 at 30].

On September 19, 2013, the Court held a sentencing hearing in Criminal Case No. 2:12-cr-00011-MR-DCK and Criminal Case No. 2:12-cr-00023-MR-DCK. The Court first confirmed that all of the Petitioner's responses to the Magistrate Judge's questions in the prior Rule 11 proceedings were true and correct. [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 33 at 5]. Petitioner's counsel confirmed that he was satisfied that the Petitioner understood all of the questions that were asked of him in the Rule 11 proceedings. [Id. at 6]. The Petitioner confirmed that he was pleading guilty in both matters because he did in fact commit the crimes charged. [Id.]. He further confirmed that he was pleading guilty voluntarily and not as a result of any threats, force or promises other than those promise set forth in the plea agreement to the conspiracy charge. [Id. at 7].

Noting that the parties had agreed to make various sentencing recommendations in the Plea Agreement, the Court confirmed that the Petitioner understood that the Court was "not required to accept those facts or factors simply because both sides have agreed" and that if the Court "decline[d] to accept any of those facts or factors in [its] sentencing decision, [the Petitioner would] not have the right to withdraw [his] plea." [Id.].

The Petitioner then stipulated that there was a factual basis to support his guilty pleas and that the Court could accept the facts as set forth in the

final revised PSR to which no objection had been made as establishing such factual basis. [Id. at 8-10]. Based upon the representations made to the Court and the answers given by the Petitioner, the Court accepted the Petitioner's guilty pleas in both matters. [Id. at 10].

During the sentencing hearing, both parties argued in favor of a minimal participant reduction in the Petitioner's offense level. The Court, however, rejected these arguments, noting that the Petitioner assisted the leader of the conspiracy by allowing himself to be portrayed as the enforcer, or "muscle," of the conspiracy and impliedly threatening violence at a time when the conspiracy was otherwise "floundering." [Id. at 41-43].[2] The Court therefore concluded that no mitigating role reduction under U.S.S.G. § 3B1.2 was warranted. [Id. at 44]. The Court ultimately calculated a total offense level of 38 and a criminal history category of II, resulting in an advisory Sentencing Guidelines range of 262 to 327 months' imprisonment. [Id. at 71]. After hearing from both parties as to the appropriate sentence, the Court imposed a downward-variance sentence of 208 months as to the conspiracy

---

[2] Even the joint recommendations of the parties in the Plea Agreement seemed inconsistent in that the Petitioner admitted that he was responsible for 947.6 grams of methamphetamine and that he used violence or a credible threat of violence in the drug transactions, but the parties recommended that such participation was "minimal." [See Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 2 at ¶ 7(a), (d), (e)].

offense and a concurrent term of 38 months as to the retaliation offenses. [Id. at 102]. The Court entered its Judgment on October 7, 2013. [Criminal Case No. 2:12-cr-00011-MR-DCK, Do. 24].

The Petitioner filed a timely notice of appeal, arguing that the Court committed procedural error in calculating Petitioner's advisory guidelines range. [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 26]. On July 11, 2014, the Fourth Circuit Court of Appeals dismissed the Petitioner's appeal upon motion of the Government, finding the issue that he sought to raise on appeal "falls squarely within the compass of his waiver of appellate rights." [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 34 at 1-2].

On October 2, 2015, the Petitioner, through retained counsel, filed the present motion to vacate pursuant to 28 U.S.C. § 2255. [CV Doc. 1]. In his motion, the Petitioner states the following five grounds for relief:

> **GROUND ONE:** Counsel was ineffective for failing to have the sentencing Court [conduct the Rule 11 hearing] in light of the significant guideline concessions being represented in the pleas and the sentencing Court's predisposition on mitigating role adjustments. Counsel was also ineffective in not knowing the Court's predisposition on mitigating role issues.

> **GROUND TWO:** The prosecution and counsel failed to support the plea agreement by presenting testimony evidence at sentencing in support of the mitigating role adjustments or incremental role reduction options resulting in ineffective assistance of counsel and prosecutorial misconduct.

14

**GROUND THREE:** The prosecution committed misconduct when it failed to provide notice to petitioner of the court's predisposition regarding mitigating role adjustment considerations before the plea was entered thus making the pleas illusory or to void [sic] knowing of the Court's predisposition . . . .

**GROUND FOUR:** Counsel was ineffective in failing to properly advise the petitioner regarding the gross misrepresentation of the guidelines in the plea as opposed to the Court's predisposition on granting minimal or minor adjustments and failed to attempt to withdraw the plea or inform the petitioner of this option.

**GROUND FIVE:** The prosecution committed misconduct when it failed to inform the petitioner of the courts [sic] predisposition regarding mitigating role adjustment considerations before the plea was entered thus making the plea illusory and failed to withdraw the plea or inform the petitioner of this option.

[CV Doc. 1 at 4-9]. In the Memorandum of Law filed by counsel in support of the Motion to Vacate, the Petitioner raises an additional issue, arguing that the Government committed prosecutorial misconduct in failing to disclose certain exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and that counsel failed to compel discovery of this information, resulting in ineffective assistance of counsel and a violation of the Petitioner's due process rights. [CV Doc. 1-1 at 21-24]. Finally, the Petitioner by way of a separate motion moves to compel certain discovery from the Government. [CV Doc. 6].

## III.    STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief.   After having considered the record in this matter, the Court finds that no response is necessary from the United States.  Further, the Court finds that this matter can be resolved without an evidentiary hearing.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## IV.    DISCUSSION

### A.    Ineffective Assistance and Prosecutorial Misconduct Claims Based on Counsels' Alleged Failure to Advise Petitioner of Court's "Predisposition" Against Granting Mitigating Role Adjustments

In order to challenge a conviction based on the ineffective assistance of counsel, a petitioner has the burden of establishing that: (1) defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) the petitioner was prejudiced thereby, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v.

Washington, 466 U.S. 668, 688, 694 (1984).  In order to assert a claim of prosecutorial misconduct, a petitioner must show "(1) that the prosecutors engaged in improper conduct, and (2) that such conduct prejudiced the defendant's substantial rights so as to deny the defendant a fair trial." United States v. Alerre, 430 F.3d 681, 689 (4th Cir. 2005).

Petitioner, through counsel, asserts five grounds for relief in his motion to vacate based on claims of prosecutorial misconduct and ineffective assistance of counsel.  In four of the grounds asserted (Grounds One, Three, Four, and Five), the Petitioner claims that the Government and defense counsel failed to advise him of the Court's alleged "predisposition" against granting minimal or minor role adjustments.  [CV Doc. 1 at 4-9].  The Petitioner's arguments are premised on a single comment, made during an exchange between the Court and defense counsel at sentencing regarding the application of U.S.S.G. § 3B1.2, wherein the Court noted that it had seen "very, very few cases" that it considered to warrant the minimal participant reduction.  [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 33 at 24].  The Petitioner contends that by this comment, the Court identified "its almost total prohibition against mitigating role adjustments." [CV Doc. 1-1 at 19].  Because of the Court's alleged "predisposition," the Petitioner contends, counsel should have known that the parties' joint sentencing

recommendations as set forth in the Plea Agreement would not be accepted by the Court.  Further, because he was not advised of this "predisposition," the Petitioner argues, his guilty plea was "illusory at best and meaningless at worst."  [CV Doc. 1 at 4].

Each of these grounds is based on the flawed premise that the Court was somehow predisposed against granting mitigating role adjustments.  In so arguing, the Petitioner relies heavily on the Court's observation that "very, very few cases" warrant the most extensive reductions for having had merely a *minimal* role in the offense.  Far from being a statement of any bias or predisposition of the Court, this statement simply reflects the reality that in the drug conspiracy cases that have been tried and/or sentenced by this Court, relatively very few defendants truly qualify for a *minimal* participant reduction (as opposed to any mitigating role adjustment).  When the Court's statement is viewed in its proper context, it is evident that the Court was merely expressing its view that the minimal participant reduction is a narrow exception that is not applicable to most defendants who are accused of engaging in a conspiracy:

> As I'm sure you know, and certainly most lawyers who appear in front of me know, I see very, very few cases that I see as minimal participant cases. In fact, I think of all the -- and I see maybe one a year that falls within the context of a minimal participant case.

All but one of them that I can think of literally falls within the so-called "girlfriend exception." In other words, the boyfriend is the one who's participating in the -- in fact, I think this is a case that you [referring to defense counsel] argued in front of me down in Charlotte. The boyfriend is the participant in the conspiracy. They find out that the shipment of drugs is coming in from who knows where and they need to parcel it out to these dealers who are then going to distribute it.

And so on the way to the mall, boyfriend and girlfriend go [to the drop-off location] and . . . he's sorting these things out and, yes, the girlfriend takes a couple of the packages and throws them in the trunk of one car. Is she a minimal participant? Yes, she is. She has this incidental contact with the conspiracy but she knows it's a drug conspiracy. She picked up the packages of the marijuana. That's what I see as a minimal participant.

[Id. at 24-25].

As the Court correctly noted at the sentencing hearing, mitigating role adjustments are available for a defendant who played a "substantially less culpable" role than the average participant in the offense. U.S.S.G. § 3B1.2 cmt. n.3(A) (2012). Under § 3B1.2, a defendant's offense level may be decreased by four levels for being a "minimal participant." U.S.S.G. § 3B1.2(a) (2012). This provision is intended to cover the defendant who is "plainly among the least culpable of those involved in" the offense. U.S.S.G. § 3B1.2 cmt. n.4 (2012). A defendant's offense level may be decreased by

two levels for being a "minor participant." U.S.S.G. § 3B1.2(b) (2012). A "minor participant" is one "who is less culpable than most other participants" in the offense "but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5 (2012). A three-level reduction is available for a defendant whose conduct falls somewhere between being a "minimal" and a "minor" participant. U.S.S.G. § 3B1.2 (2012).

Whether a defendant is entitled to a reduction for a mitigating role is a fact-intensive inquiry that is "based on the totality of the circumstances" of the particular case. U.S.S.G. § 3B1.2 cmt. n.3(C) (2012). Whether a mitigating role adjustment is warranted should be "determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction." United States v. Palinkas, 938 F.2d 456, 460 (4th Cir.1991) (internal quotation marks and citation omitted). "The critical inquiry is thus not just whether the defendant has done fewer 'bad acts' than his co-defendants, but whether the defendant's conduct is material or essential to committing the offense." United States v. Pratt, 239 F.3d 640, 646 (4th Cir. 2001) (quoting Palinkas, 938 F.2d at 460).

Here, upon considering the totality of the circumstances, the Court ultimately concluded that the Petitioner was not entitled to any mitigating role adjustment. In so doing, the Court noted that this was an "extremely difficult" case in light of the unique role that the Petitioner played in the conspiracy. [Criminal Case No. 2:12-cr-00011-MR-DCK, Doc. 33 at 41]. Most of the other co-conspirators were involved primarily in the sale or distribution of methamphetamine at the direction of Michael Taylor. The Petitioner participated in several of these methamphetamine transactions but not as a seller or buyer. The Petitioner nevertheless participated in the conspiracy in a manner that was material to the commission of the crime by serving as Michael Taylor's right hand man and by allowing himself to be portrayed as the "muscle." This impression, which the Petitioner fostered, was meant to convey to others a threat of violence that was necessary to support the conspiracy and its overall goal.

Determining whether the Petitioner was entitled to a mitigating role adjustment first required comparing the Petitioner's involvement to the involvement of others who were also part of the conspiracy. In order to satisfy this component of § 3B1.2, the Petitioner would have had to establish that his actions in allowing himself to be portrayed as the muscle (along with its implicit threat of violence), in addition to participating in some

methamphetamine deliveries, rendered him substantially less culpable than the average participants, i.e., those who participated in the selling and the delivery of the drugs. In light of the unique circumstances of this particular conspiracy, the Court properly concluded that the Plaintiff had not met his burden on this issue. Taylor required the continued implied threat of violence provided by the Petitioner in order to continue operating the methamphetamine distribution conspiracy. Without the "muscle" supplied by the Petitioner, the Court determined that the conspiracy was "floundering." [Id. at 43]. Thus, the Petitioner's involvement was every bit as critical to the success of the conspiracy as those who routinely sold and delivered methamphetamine.

Section 3B1.2 next required comparing the Petitioner's acts against the elements of the offense. To prove a federal drug conspiracy, the Government would have had to adduce competent evidence that an unlawful agreement was made to distribute methamphetamine; that the Petitioner knew of the conspiracy; and that the Petitioner knowingly and voluntarily became a part of that conspiracy. See United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996). Here, the Petitioner agreed to be the enforcement arm of the conspiracy. As the Petitioner's involvement was essential to maintaining the operations of the conspiracy, the Court properly concluded

that the Petitioner was not substantially less culpable than the average participant in the conspiracy.  [Id.].  Thus, while the parties stipulated in the Plea Agreement that the Petitioner was a minimal participant in the conspiracy, the Court ultimately concluded that application of U.S.S.G. § 3B1.2 to the particular facts of this case did not support any reduction for a mitigating role.[3]

The Petitioner contends that his counsel was ineffective in failing to recognize that the Court would not accept the parties' joint sentencing recommendations and in failing to advise him to withdraw the Plea Agreement.  He further contends that the Government committed prosecutorial misconduct in agreeing to make sentencing recommendations that the Government knew that the Court would not accept.  Again, however, the Court was not predisposed against granting any mitigating role adjustments.  Rather, the Court was intent upon applying § 3B1.2 and relevant Fourth Circuit precedent.

---

[3] In Ground Two, the Petitioner contends that when the Court rejected the parties' recommendation that the Petitioner receive a minimal participant reduction, counsel was ineffective in failing to advocate for at least a minor role reduction instead.  The Court's analysis, however, applied to *any* type of mitigating role under § 3B1.2, whether as a minor or minimal participant.  In the end, neither adjustment was warranted.  Thus, counsel's alleged failure to advocate specifically for the minor role reduction did not cause the Petitioner any prejudice.

The Petitioner was repeatedly and clearly advised that the parties' joint sentencing recommendations did not bind the Court in any way. In his Plea Agreement, the Petitioner acknowledged that the Court had the discretion to impose any sentence up to the statutory maximum and that the Court would not be bound by any recommendations or agreements made by the Government. At his Rule 11 hearing, the Petitioner confirmed under oath that he understood that if the imposed sentence was more severe than expected or if the Court did not accept the Government's sentencing recommendation, he would still be bound by his guilty plea and would have no right to withdraw it. At his sentencing hearing, the Petitioner again confirmed that he understood that the Court was not required to accept the parties' joint sentencing recommendations and that if Court declined to accept those joint recommendations, he would not have the right to withdraw his guilty plea. The Petitioner was advised repeatedly that the joint sentencing recommendations were not binding on the Court, and therefore the Petitioner cannot demonstrate any prejudice by counsel's performance with respect to advising him about withdrawing his guilty plea.

The Petitioner further contends that counsel "grossly misadvised" him of his potential sentencing exposure in accepting the guilty plea. [CV Doc. 1-1 at 8]. In support of this contention, the Petitioner offers several affidavits

of family members and friends who state that defense counsel had advised them that by pleading guilty, the Petitioner would be sentenced to a term of five years' imprisonment. [CV Doc. 1-1 at 8; CV Doc. 1-2]. These affidavits, however, directly contradict the Petitioner's own sworn statements at his Rule 11 hearing that he understood the minimum and maximum penalties for the offense; that he understood that the Court was not bound by the parties' joint sentencing recommendations; and that the Court was not bound by the Sentencing Guidelines and could impose a sentence that was greater or less than the recommended Guideline sentence. To the extent that these affidavits imply that counsel promised a particular sentence, such affidavits are squarely refuted by the Petitioner's sworn acknowledgement that no promises were made to him regarding a particular sentence being imposed. If the solemnity, care, and personal attention required of a plea colloquy has any meaning at all, its binding force cannot be undone simply by the factually unsupported, post-hoc allegations of a disgruntled defendant and his family members. See United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005) ("Thus, in the absence extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn

statements. Otherwise, a primary virtue of Rule 11 colloquies would be eliminated....") (citing <u>Blackledge v. Allison</u>, 431 U.S. 63, 79 n. 19 (1977)). Accordingly, the Petitioner's claim of ineffective assistance in this regard must fail.

In sum, the Court's decision not to apply any mitigating role adjustment was not the result of any predisposition against granting such reductions but rather was the result of the considered evaluation of the evidence before the Court and the application of binding precedent to such evidence. Thus, to the extent that the Petitioner bases his claims of ineffective assistance and prosecutorial misconduct on a theory that the Court was predisposed against granting mitigating role adjustments, such claims are without merit and are therefore dismissed.

### B. Ineffective Assistance and Prosecutorial Misconduct Arising from the Parties' Failure to Present Evidence in Support of Mitigating Role Adjustments

In Ground Two, the Petitioner argues that the Government committed prosecutorial misconduct and that his trial counsel was ineffective when they both "failed to support the plea agreement by presenting testimonial evidence at sentencing in support of the mitigating role adjustments or incremental role reduction options . . . ." [CV Doc. 1 at 5]. Specifically, the Petitioner argues that his counsel was ineffective in failing to present the

testimony of Michael Taylor, who the Petitioner contends would have testified that the Petitioner "was working legitimate jobs for Mr. Taylor and was used by him because Taylor knew the Petitioner would do whatever Taylor asked, having known him as family since Petitioner [sic][4] was a young child." [CV Doc. 1-1 at 15].

The Petitioner fails to demonstrate, however, that the result of the sentencing would have been different had counsel presented Taylor's live testimony. "Deficient performance is prejudicial only if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" See Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003) (quoting in part Strickland, 466 U.S. at 694). Here, counsel argued at sentencing that the Petitioner was employed by Taylor to perform legitimate work for Taylor's business and that to the extent that the Petitioner performed any task on behalf of the conspiracy, he was motivated to do so due to his familial-like relationship to Taylor. Thus, the substance of Taylor's proposed testimony was presented to the Court through the arguments of counsel. Further, while the Petitioner did not qualify for a

---

[4] The PSR indicates that the Petitioner had been in a relationship with Taylor's mother and acted as a step-father to Taylor; thus, it is unlikely that Taylor was acquainted with the Petitioner when the *Petitioner* was a young child.

minimal participant reduction under U.S.S.G. § 2D1.1(b)(15), the Court accounted for the fact that the Petitioner's involvement in the conspiracy was motivated by a familial interest in helping Taylor when the Court varied downward from the recommended Guidelines range. The Petitioner fails to demonstrate what difference it would have made if counsel had presented such information through the live testimony of Taylor.

While Taylor may have provided favorable testimony for the Petitioner on some points, it must be noted that Taylor had also made various statements to co-defendants and law enforcement indicating that the Petitioner's assistance went far beyond performing merely "legitimate jobs." Taylor referred to the Petitioner repeatedly as his "right hand man" and acknowledged that the Petitioner played the role of an "enforcer" in the conspiracy. In light of this evidence, the Petitioner simply cannot demonstrate prejudice from counsel's failure to present the live testimony of Michael Taylor at sentencing. This claim, therefore, is also dismissed.

## C.  Alleged **Brady** Violations

In Ground Five of his Motion to Vacate, the Petitioner asserts that the Government "committed misconduct when it failed to inform the petitioner of the courts [sic] predisposition regarding mitigating role adjustment considerations…." [CV Doc. 1 at 9]. In the Memorandum filed in support of

the Motion to Vacate, however, the Petitioner makes a completely different argument as his fifth ground for relief. Specifically, the Petitioner argues that the Government committed misconduct in failing to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that counsel failed to compel discovery of this information, resulting in ineffective assistance of counsel and a violation of the Petitioner's due process rights. [CV Doc. 1-1 at 21-24]. The Petitioner specifically identifies three pieces of evidence that the Government allegedly failed to disclose: (1) a text conversation between co-conspirator Wesley Hargett and the Petitioner in which Hargett offered to sell the Petitioner a gun and the Petitioner refused; (2) a recorded phone call between Hargett and the Petitioner in which Hargett offered to pay the Petitioner to go and pick up money from someone and the Petitioner refused; and (3) a letter that the Petitioner wrote to Taylor in March or April 2011 while the Petitioner was still incarcerated on his kidnapping charge in which he encouraged Taylor not to engage in illegal activities. [See CV Doc. 1-1 at 23-24].

The Petitioner's Brady claim is without merit. In order to establish a Brady violation, a petitioner must demonstrate that: (1) the evidence was suppressed by the prosecution; (2) such evidence was favorable to the defendant, whether because it was directly exculpatory or it had

impeachment value, and (3) it was material.  <u>Spicer v. Roxbury Corr. Inst.</u>, 194 F.3d 547, 555 (4th Cir. 1999).  The <u>Brady</u> rule does not apply, however, "if the evidence in question is available to the defendant from other sources, either directly or via investigation by a reasonable defendant."  <u>United States v. Brother Constr. Co. of Ohio</u>, 219 F.3d 300, 316 (4th Cir. 2000) (internal citations omitted). Here, by his own admission, the Petitioner was the recipient of both the text message and the phone call from Hargett, and he was the author of the letter to Taylor.  Thus, the substance of this evidence was equally available to the Petitioner as it was to the Government. Therefore, the Petitioner has not established that the Government violated <u>Brady</u> by failing to provide this evidence to him, nor has he shown that his counsel was ineffective in failing to compel such discovery from the Government.  Further, the Petitioner has not demonstrated how this evidence was in any way material to the determination of his guilt or innocence of the crimes to which he pleaded guilty.  For these reasons, the Petitioner's fifth ground for relief as stated in his Memorandum of Law is dismissed.

### D.    Motion for Discovery

By way of a separate motion, the Petitioner seeks leave to conduct discovery with respect to his claims.  [CV Doc. 6].  The Rules Governing

Section 2255 Proceedings provide that the Court may authorize discovery upon a showing of "good cause."  See Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255. The Petitioner has failed to demonstrate good cause to invoke the discovery process in this case.  Accordingly, the Petitioner's request for discovery is denied.

## V.    CONCLUSION

For the foregoing reasons, the Petitioner's motion to vacate is denied and dismissed, and his motion for discovery is denied.    The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right.  See generally 28 U.S.C. § 2253(c)(2); see also Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong") (citing Slack v. McDaniel, 529 U.S. 473, 484-85 (2000)).  The Petitioner has failed to demonstrate both that this Court's dispositive procedural rulings are debatable, and that the motion to vacate states a debatable claim of the denial of a constitutional right.  Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).  As a result, the Court declines to issue a certificate of appealability.

See Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255.

## O R D E R

**IT IS, THEREFORE, ORDERED** that Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [CV Doc. 1] is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Post-Conviction Discovery Pursuant to Rule 6 of the Rules Governing 2255 Habeas Proceedings [CV Doc. 6] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: March 7, 2017

Martin Reidinger
United States District Judge